**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **MARY GOGGINS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )     **Case number 4:05cv2359 TCM** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of Social Security,[1]** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying the application of Mary Goggins for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, is before the Court[2] for a final disposition. Ms. Goggins ("Plaintiff") has filed a brief in support of her complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Plaintiff applied for DIB in July 2003, alleging a disability since March 15, 1992, caused by rheumatoid arthritis, discoid lupus, high blood pressure, chronic joint pain,

---

[1]Mr. Astrue was sworn in as the Commissioner of Social Security on February 12, 2007, and is hereby substituted as defendant pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

[2]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

medication side effects, limited mobility, and anemia. (R. at 59-61.[3]) Her application was denied initially and after a hearing held in February 2005 before Administrative Law Judge ("ALJ") H. Lloyd Kelley, III. (Id. at 1-15, 17, 33-42, 280-315.) The Appeals Council then denied review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 3-5.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing.

Before her testimony began, the ALJ noted that only the medical records from Boonslick Medical Group, Inc. ("Boonslick"), were earlier than December 31, 1995, the date she was last insured. (Id. at 283.)

Plaintiff testified that she last worked full-time in 1989 in a department store as a jewelry clerk. (Id. at 285-88.) After that, she worked only during a holiday season, with the exception of trying to babysit in 1996. (Id. at 288-89, 297.) When she worked as a jewelry sales clerk, there was no place or time to sit down. (Id. at 301.) In an eight-hour day, she had two 15-minute breaks and one 45-minute lunch period. (Id. at 302.) These were the only times she was permitted to sit down. (Id.) She explained that she had to stop working because of stress, anxiety, and the need to rest. (Id. at 290.) When she tried to babysit a six-week old child, she had to rest for a couple of hours each day. (Id. at 297.) Also, she could

---

[3]References to "R." are to the administrative record filed by the Commissioner with his answer.

not stand and concentrate for an eight-hour day. (<u>Id.</u> at 290.) She had these problems in 1989 when she last worked, but they were not serious then. (<u>Id.</u>) Specifically, the lupus caused a rash on her head, face, and arms. (<u>Id.</u>) The rash would start as blisters and then leave irritating, scab-like spots. (<u>Id.</u> at 291.) The rash would result from being exposed to heat and cold or to anxiety and stress, and would occur at least once a month. (<u>Id.</u> at 291, 295.) She had been told to stay out of the sun. (<u>Id.</u> at 290.) During this same time, she had arthritis pain in her joints. (<u>Id.</u> at 292.) The pain was intermittent. (<u>Id.</u>) If she did general housework, she would start getting tired and achy in her joints after a few hours. (<u>Id.</u> at 293-94.) She would then have to move around, massage her joints, and apply heat or ice. (<u>Id.</u> at 294.) Stress caused her to get nervous and upset and to develop rashes and headaches. (<u>Id.</u> at 295.)

During the relevant time, she did not have any problems with her hands. (<u>Id.</u>) She had since developed problems with her hands being cold and numb. (<u>Id.</u>) When that happened, they were also painful. (<u>Id.</u>)

Plaintiff's headaches were caused by chronic sinus problems. (<u>Id.</u>) Every three or four months, the headaches were so severe she had to lie down for a few hours and close her eyes. (<u>Id.</u> at 296.) In 1996, when she attempted to babysit, she spoke to her doctor about fatigue. (<u>Id.</u> at 298.) He attributed it to the lupus, arthritis, or, possibly, her medication. (<u>Id.</u>)

Plaintiff did not see a specialist about her arthritis in the years from 1992 through 1995. (<u>Id.</u> at 298-99.) The doctors at Boonslick would try different medications until

finding one that would that help her. (Id. at 299.) The pain from the arthritis was between a seven and an eight on a scale from one to ten, with ten requiring emergency room attention. (Id.) She would take Tylenol and massage her joints to relieve the pain. (Id.) Sometimes, she would apply heat to her joints. (Id. at 300.)

Asked by the ALJ if her condition had improved or become worse after 1995, Plaintiff replied that her weakness was now in her entire body and the pain was in her hands, joints, legs, and knees. (Id. at 301.)

At the conclusion of Plaintiff's testimony, her attorney argued that res judicata should not apply to the denial of a previous DIB application alleging the same disability onset date because the Social Security Administration failed in its duty to develop the record based on a 2001 letter from Plaintiff's doctor with Boonslick, Dr. Piening, that Plaintiff was disabled. (Id. at 303.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to that application, and medical records.

A disability report was completed by Plaintiff in August 2003. (Id. at 84-95.) The illnesses limiting her ability to work were discoid lupus and rheumatoid arthritis, resulting in pain in her joints and a low immune system. (Id. at 84.) She had worked as a cashier and sales clerk in a department store from September 1987 to 1991. (Id. at 85.) This job required that each day she walked for eight hours, stood for one, climbed for eight, stooped

for eight, knelt for eight, crouched for eight, wrote, typed or handled small objects for one, and handled, grabbed, or grasped big objects for two. (<u>Id.</u> at 86.) She became unable to work on March 15, 1992. (<u>Id.</u> at 85.) She had tried to work after that date, but had to stop working on July 20, 1996. (<u>Id.</u>) She listed five doctors, two of whom she had seen before 1995. (<u>Id.</u> at 87-88.) Those two were Kurt Piening, M.D., and John Uhlemann, M.D. (<u>Id.</u>) The highest grade Plaintiff had completed was tenth. (<u>Id.</u> at 90.) She noted that she would no longer have any medical insurance after August 2003. (<u>Id.</u>)

Plaintiff reported on a claimant questionnaire in February 2002, completed pursuant to an earlier DIB application, that her joint pain and swelling were worse after activity; she was very tired most of the time; and she was light-headed at other times. (<u>Id.</u> at 112.) She also had blurred vision. (<u>Id.</u>) Medication helped some. (<u>Id.</u>) She constantly had trouble with her symptoms. (<u>Id.</u>) She rested when possible. (<u>Id.</u>)

Plaintiff's earnings record reflects income for the years 1974 through 1991, inclusive, and in 1996. (<u>Id.</u> at 47.) Her highest annual income was $8,281.73, in 1988. (<u>Id.</u>) Her next highest was $6,741.72, in 1986. (<u>Id.</u>) In 1991, her income was $253.12; in 1996, it was $608.00. (<u>Id.</u>) In the eighteen consecutive years in which Plaintiff had earned income, it averaged more than $500 monthly in only five. (<u>Id.</u>)

An internal report listed a prior DIB application for Plaintiff. (<u>Id.</u> at 97-98.) This application was denied on April 2002. (<u>Id.</u> at 97.) She did not pursue it after the initial denial. (<u>Id.</u>)

The records of Plaintiff's medical treatment are summarized as follows.

Kurt Piening, M.D., with Boonslick, began treating Plaintiff in December 1992. (<u>Id.</u> at 195.) She had a history of discoid lupus[4] and chronic sinus problems. (<u>Id.</u>) On examination, she also had symptoms of gastroesophageal reflux disease ("GERD") due to increased stress – her husband had lost his job – and increased smoking. (<u>Id.</u>) She took medication, Plaquenil, for the lupus when it flared up and was prescribed Zantac for the reflux. (<u>Id.</u>) Plaintiff twice contacted Dr. Piening's office during the next six months for refills on the reflux medication. (<u>Id.</u>) She consulted him again in June 1993, reporting that the Zantac was not working. (<u>Id.</u> at 194.) The reflux was worse when she lay down. (<u>Id.</u>) Her muscles cramped, and she could not tolerate heat. (<u>Id.</u>) He increased her dosage of Zantac. (<u>Id.</u>)

Plaintiff's appendix ruptured in August, and she next saw Dr. Piening for follow-up after her release from the hospital. (<u>Id.</u> at 193-94.) He restarted her on the Zantac. (<u>Id.</u> at 193.) The next month, she had a lupus flare-up. (<u>Id.</u>) She was using a topical medication. (<u>Id.</u>) Her blood pressure was fine. (<u>Id.</u>)

When Plaintiff next saw Dr. Piening, in March 1994, she complained of indigestion. (<u>Id.</u>) She had been off the Zantac; her prescription was renewed. (<u>Id.</u>) Six months later, she consulted him about right-sided back and rib pain. (<u>Id.</u> at 192.) It was worse with movement. (<u>Id.</u>) Her GERD was still bothersome. (<u>Id.</u>) Her prescription for Zantac and a

---

[4]Discoid lupus erythematosus is "[a] chronic and recurrent disorder primarily affecting the skin[.]" <u>Merck Manual</u> at 1316 (16 th ed. 1992) (alterations added) Systemic lupus erythematosus is "[a]n inflammatory connective tissue disorder." <u>Id.</u> at 1317 (alteration added).

topical cream for her lupus were renewed.  (Id.)  In December, it was noted that her face had broken out; her prescription for Plaquenil was renewed.  (Id.)

In March 1995, Plaintiff reported feeling tired and run down.  (Id.)  Her daughter had moved in; her husband had had hernia surgery.  (Id.)  She had increased her smoking.  (Id.)  She was prescribed Motrin for her back pain and Xanax for her anxiety.  (Id.)  Two months later, she was still under stress.  (Id.)  She had felt better, however, when on the Xanax; the prescription was renewed.  (Id.)  She continued to have back pain, and had skin lesions on her face and scalp.  (Id.)

On referral from Dr. Piening, she consulted the dermatology clinic[5] five days later.  (Id. at 191.)  Her prescription for Plaquenil was renewed.  (Id.)  She was also prescribed a topical cream to put on the lesions.  (Id.)  She returned to the dermatology clinic in June.  (Id. at 190.)  The lesions had either completely or nearly resolved; her face was red.  (Id.)  Her prescription for Plaquenil was again renewed.  (Id.)

Plaintiff contacted Dr. Piening's office in December and again in January 1996 for a cough, sore throat, and cold.  (Id.)

Once a month in February, March, and April, she returned to the dermatology clinic for treatment of her rash and lesions.  (Id. at 189.)  In May, she contacted Dr. Piening about a cough, runny nose, and head congestion.  (Id. at 188.)  After the cough did not resolve, she went to the office the following month.  (Id.)  The congestion was worse in the morning and at night.  (Id.)  In September, she consulted the dermatology clinic.  (Id.)  Her rash was worse

_____

[5]It appears from the record that the dermatologist was Dr. Uhlemann.

in the heat.  (Id.)  She was again treated in the dermatology clinic in October.  (Id. at 187.)  Also in October, she consulted Dr. Piening about a stiff neck, a sore throat, and her GERD.  (Id.)  It was noted that she had a rash on her face.  (Id.)  She was to be referred to a Dr. Ross for a diagnosis of a possible connective tissue disease.  (Id.)  She again saw Dr. Piening in January 1997.  (Id. at 186.)  Her rash was worse; however, her hypertension was stable off medication.  (Id.)

In February and April, Plaintiff consulted the dermatology clinic about her rash.  (Id.)  It was worse in April.  (Id.)  She was to return to the rheumatologist.  (Id.)  In July, the rash had spread.  (Id.)  Complaining of pain on movement, Plaintiff telephoned Dr. Piening's office in December and was sent for a chest x-ray.  (Id.)

Other than complaints of a cold in March 1998, the next medical record of Dr. Piening is dated in July 1998.  (Id.)  Her discoid lupus was described as stable on her current medications.  (Id.)  She needed a new rheumatologist.  (Id.)

When she next saw Dr. Piening, in January 1999, her blood pressure had increased.  (Id. at 184.)  She was started on a medication to control it.  (Id.)  In February, she reported being fatigued and having diffuse aches and pains.  (Id.)  In June, she reported having a chronic cough.  (Id. at 183.)  A notation from a July visit to the dermatology clinic reads that Dr. Steven Lauter was questioning the diagnosis of discoid lupus.  (Id.)  At the same visit, Plaintiff's rheumatoid factor was listed as 64.5  (Id. at 182.)  She had had a flare up when she was off the Plaquenil, and no flare up with treatment.  (Id.)  At her next visit to Dr. Piening, in November, it was reported that Dr. Lauter wanted to increase Plaintiff's dosage of

Celebrex. (Id.) She had pain in her arms and legs, and swelling in her right leg. (Id.) Celebrex was switched to Vioxx to alleviate her gastrointestinal symptoms. (Id.) A subsequent chest x-ray in February 2000 revealed obstructive pulmonary disease. (Id. at 213.) A follow-up x-ray was recommended. (Id.)

Plaintiff reported in March that the Vioxx was working well. (Id. at 181.) Her cough had gone; her lupus had improved. (Id.) Her blood pressure had slightly increased; it was to be followed. (Id.) At her next office visit, in July, Plaintiff reported that she felt well. (Id. at 180.) She had intermittent joint pain, intermittent gastrointestinal problems, fatigue, and depression. (Id.) It was thought she might have a vitamin B12 deficiency. (Id.) A chest x-ray showed mild emphysema, but no active cardiopulmonary disease. (Id. at 211.) She was also prescribed Wellbutrin; however, that was stopped at her next visit, in December, due to the side effects. (Id. at 180.) The diagnosis was hypertension, an increase in lipids, and discoid lupus. (Id. at 179.) A chest x-ray revealed no significant change and no active disease. (Id. at 203.) Plaintiff was prescribed Lipitor, but that prescription was stopped in March 2001, when Plaintiff next saw Dr. Piening. (Id. at 179.)) Her leg pain had improved, her knee and ankle pain had not. (Id.)

Dr. Piening wrote "To Whom It May Concern" in May that Plaintiff had chronic joint pain and skin irritations from the discoid lupus.[6] (Id. at 202, 272.) Her medications caused multiple side effects. (Id.) Her mobility, stamina, and ability to work were severely limited.

---

[6]Dr. Piening wrote again in September 2004 to state his opinion that the conclusions in his May 2001 letter would have been true as of December 31, 1995. (Id. at 246.)

(Id.)  In his medical opinion, she was "unable to pursue or maintain gainful employment because of her medical condition.  She is clearly fully disabled . . ."  (Id.)

In June, Plaintiff consulted both Dr. Piening and the dermatology clinic.  (Id. at 178.) The former she consulted about loose bowel movements and pain in her neck, legs, and elbows.  (Id.)  Her cholesterol was high.  (Id. at 199.)  The dermatology clinic she consulted about a cyst on her right check and for a follow-up on her lupus.  (Id. at 178.)  She consulted Dr. Piening again in September after she fell and hurt her right knee and hand.  (Id. at 177.) Blood tests revealed that her red blood count was low.  (Id. at 196-97.)  In January 2002, she consulted him about pain that was worse when she coughed, took a deep breath, or moved. (Id. at 176-77.)  A chest x-ray revealed emphysema, but no active pulmonary disease.  (Id. at 201.)  Another chest x-ray in February 2003 indicated early hyperinflation but no other abnormality.  (Id. at 271.)

As noted, Dr. Piening referred Plaintiff to Stephen Lauter, M.D., a rheumatologist. Dr. Lauter first saw Plaintiff in September 1998.  (Id. at 158, 160-62.[7])  X-rays of her hands revealed osteoporosis in her left hand and bony demineralization in her right hand.  (Id. at 160.)  Bone density studies were ordered and performed of her hip and spine in October.  (Id. at 145-53, 158.)  She had diminished bone density in her spine at L1-L4; therapy was recommended.  (Id. at 145.)

---

[7]There is no page 159.

Plaintiff consulted Dr. Lauter again in February 1999 for chest congestion and a cough. (Id. at 155, 157.[8]) She had decreased her smoking. (Id. at 155.) A chest x-ray revealed some aortic elongation; a pectus deformity of the sternum; degenerative changes in the dorsal spine; apical pleural thickening bilaterally; hyperinflation; and a pleural reaction in the right base. (Id. at 157.) There was no pulmonary fibrosis. (Id.) Plaintiff next, and last, consulted Dr. Lauter in October 1999, reporting that Celebrex was of little help. (Id. at 154.) Most of her joint pain was in her ankles and knees. (Id.) Some days, her stiffness lasted several hours. (Id.) As a result of the lupus, she had a rash on her scalp. (Id.) A topical cream helped. (Id.) His diagnosis was rheumatoid arthritis and discoid lupus, rule out systemic lupus erythematosus ("SLE").[9] (Id.)

Dr. Piening also referred Plaintiff to Stephen C. Ross, M.D.. (Id. at 241-42.) Dr. Ross first evaluated Plaintiff in December 1996. (Id.) Other than her discoid lupus, the physical examination was "otherwise unremarkable." (Id. at 242.) Her cervical spine did have, however, a 25% limitation of lateral bending to her right and 40% limitation of lateral bending to her left. (Id.)

Dr. Ross saw Plaintiff again in August 1997. (Id. at 234.) The rash on her face was "much worse" since she had stopped taking Plaquenil. (Id.) The diagnosis was discoid lupus and polyarteritis. (Id.) The next month, Plaintiff reported feeling "much better" – better than she ever had. (Id.) Her skin and joints had improved, although she still had to use the

---

[8]There is no page 156.

[9]See note 4, supra.

bathroom once or twice a night. (<u>Id.</u>) And, she occasionally had sinus headaches. (<u>Id.</u>) Two months later, her joints continued to do well, she still felt much better, and she had energy. (<u>Id.</u> at 233.) She had also had a mild recurrence of a rash on her face and scalp. (<u>Id.</u>) In October, Plaintiff stated that her rash was generally less intense, although she still had good and bad days. (<u>Id.</u>) Her joints were not swollen; her hair was thinning. (<u>Id.</u>)

When Plaintiff next saw Dr. Ross, in December, her rash was under control and her joints were fine. (<u>Id.</u> at 232.) She had had right rib pain, but a chest x-ray was negative. (<u>Id.</u>) She was better. (<u>Id.</u>) The diagnosis remained the same. (<u>Id.</u>) In February 1998, Plaintiff reported having had pain in her right hip; it was then better but was worse when she was shoveling snow. (<u>Id.</u> at 231.) Her facial rash had greatly improved; her fatigue came and went. (<u>Id.</u>) The next month, she had pain in her knees, ankles, and right shoulder. (<u>Id.</u>) The latter limited her range of motion in that shoulder. (<u>Id.</u>) She was using a moisturizing cream for facial eruptions. (<u>Id.</u>) In April, Plaintiff reported having low back pain in the morning. (<u>Id.</u> at 230.) Her gait was normal. (<u>Id.</u>) The diagnosis remained the same. (<u>Id.</u>) Plaintiff reported at the next visit, in June, that she had had bilateral calf, knee, and above-the-knee pain. (<u>Id.</u> at 229.) Her facial rash was no worse. (<u>Id.</u>) In addition to medications previously prescribed, Dr. Ross recommended exercise and Tylenol. (<u>Id.</u>)

Plaintiff next saw Dr. Ross in May 2002, at which time she had raised, red lesions on her face and scalp. (<u>Id.</u> at 228.) In addition to vitamin B12 and D, she was taking five medications. (<u>Id.</u>) In August, Plaintiff reporting having painful knees and ankles. (<u>Id.</u> at 227.) One medication, Motric, was discontinued; the dosage of another, Prednisone, was

increased.  (Id.)  The diagnosis was discoid lupus and polyarteritis.  (Id.)  The next month, Plaintiff stated that she felt better on the Prednisone and was moving better.  (Id. at 226.) She was no longer alternating between feeling hot and sweaty and then cold.  (Id.)  In October, Plaintiff again was described as feeling better than she had been.  (Id.)  Her feet and legs felt cold during the night, although they did not change color.  (Id.)

In January 2003, after x-rays had been taken of her cervical spine, Dr. Ross diagnosed Plaintiff as also having degenerative joint disease in her lower cervical spine and, consequently, a decreased range of motion in that spine.  (Id. at 225, 245.)  Her neck was painful.  (Id.)  Plaintiff took Tylenol for her headaches.  (Id.)  In May, Plaintiff contacted Dr. Ross about her painful right shoulder; an MRI was ordered.  (Id. at 224.)  An MRI revealed a tear of her right rotator cuff tendon.  (Id. at 243-44.)  She told Dr. Ross in June that she had had surgery on her right shoulder, was doing physical therapy, and felt better.  (Id. at 222.) She also told him that her COBRA medical insurance ended in August and that she was finding it difficult to obtain insurance due to her SLE.  (Id.)  He explained she had discoid lupus and polyarteritis.  (Id.)  On examination, she had a decreased range of motion in her right shoulder and a rash on her face.  (Id.)

The following January 2004, Plaintiff complained to Dr. Ross of pain in her ankles and knees and a painful swelling in her right shoulder.  (Id. at 221.)  Her hands and feet got cold.  (Id.)  Her face was clear.  (Id.)  Six months later, she complained of pain in her left upper extremity and numbness in her left fingers.  (Id. at 219.)  Her muscles were ached; her joints were swollen.  (Id.)  She felt light-headed.  (Id.)

While being treated by Dr. Ross, Plaintiff consulted John B. Powell, M.D. Dr. Powell wrote Gene Roxas, M.D., in May 2003 after evaluating Plaintiff's right shoulder. (<u>Id.</u> at 217.) Plaintiff reported having pain in her right shoulder for the past month. (<u>Id.</u>) The pain was slowly getting worse. (<u>Id.</u>) X-rays revealed some minimal degenerative changes about her joint; a magnetic resonance imaging ("MRI") scan revealed a full thickness rotator cuff tear. (<u>Id.</u>) She was to have surgery to repair the tear. (<u>Id.</u>) Eight days after the surgery, she was doing well. (<u>Id.</u> at 215.) Three weeks later, she was doing well and was to begin some therapy. (<u>Id.</u>) Six weeks afterwards, she was making slow progress and needed physical therapy. (<u>Id.</u> at 216.) Ten weeks afterwards, she had finished the therapy and was doing well. (<u>Id.</u>) She had a good range of motion and reasonable strength. (<u>Id.</u>) She was going to continue her exercises. (<u>Id.</u>)

Also while being treated by Dr. Ross, Plaintiff consulted R. Geisman, M.D., in June 2002 about her diarrhea, nausea, and heartburn of several years' duration. (<u>Id.</u> at 253.) She informed him she smoked one pack of cigarettes a day and had approximately two drinks a day. (<u>Id.</u>) She was scheduled for a colonoscopy and upper endoscopy and encouraged to stop smoking. (<u>Id.</u>) The colonoscopy revealed a colon polyp, mild diverticulosis, and hemorrhoids. (<u>Id.</u>) The endoscopy revealed gastritis, mild esophagitis, and a small hiatal hernia. (<u>Id.</u>) A computed tomography ("CT") scan of her abdomen and pelvis were negative, with the exception of the latter being post hysterectomy. (<u>Id.</u> at 269-70.) One medication was discontinued; another, Nexium, was prescribed. (<u>Id.</u> at 253.) She was to take Metamucil every day. (<u>Id.</u>) Two months later, she reported that she was still having

indigestion and diarrhea.  (Id. at 252.)  She was also still smoking.  (Id.)  An abdominal exam was normal.  (Id.)  She was started on a new medication in case her symptoms were caused by irritable bowel syndrome.  (Id.)

Plaintiff reported at her next office visit, in November, that the Nexium was helping "fairly well."  (Id. at 251.)  She was still having problems at night and was encouraged to stop her habit of having a snack before going to bed and to try "head-of-bed elevation."  (Id.)  She had decreased her smoking to three-quarters of a pack.  (Id.)  Zantac was also prescribed.  (Id.)  The next time Plaintiff saw Dr. Geisman, in February 2003, she complained of neck and back pain, sinus drainage, chills, and some nausea.  (Id.)  He diagnosed bronchitis.  (Id.)  In March, Plaintiff reported that she was doing "fairly well."  (Id. at 250.)  Her stomach still bothered her at times; she was still smoking and had not tried the "head-of-bed elevation."  (Id.)  She had a dry mouth.  (Id.)  She was urged to see an ear, nose, and throat specialist, although Dr. Geisman predicted that it was her smoking that was causing her problems.  (Id.)  She was to continue taking the Nexium and the Zantac, as needed.  (Id.)  When Plaintiff returned four months later at her next scheduled visit, she stated that her stomach was better and she was only taking the Nexium.  (Id. at 250.)  She would not do the elevation.  (Id.)  "She [was] doing fairly well."  (Id.)

Seven months later, in February 2004, Plaintiff consulted Dr. Geisman about constant pain in all her joints.  (Id. at 249.)  He diagnosed her with a upper respiratory infection or bronchitis.  (Id.)  In November, Plaintiff reported feeling lightheaded and unsteady on her feet.  (Id. at 248.)  Her appetite and GERD were okay; her hands were cold.  (Id.)  Also, she

was tired and slept a lot.  (Id.)  An MRI and electrocardiogram ("EKG") were to be scheduled.  (Id.)  The MRI of her brain was within normal limits.  (Id. at 267.)  The EKG was abnormal.  (Id. at 268.)

Also before the ALJ was an undated, unsigned "Residual Functional Capacity" form that was completed on behalf of Plaintiff in May 2001 by Dr. Piening's nurse practitioner at his directions.  (Id. at 273-74, 277.)  Her symptoms were listed as a butterfly rash, discoid lupus, GERD, anxiety, photosensitivity, malaise, Raynaud's phenomenon, nonarthritic joint pain and swelling, pleurisy, pericarditis, and alopecia.  (Id. at 273.)  She had pain throughout her body.  (Id.)  The pain was precipitated by standing, sitting, walking, fatigue, stress, overuse and "other."  (Id.)  Plaintiff's impairments had lasted longer than 12 months and resulted in symptoms of limited motion, tenderness to palpitation, disc abnormality, muscle spas, arthritic changes, and joint or spinal deformity.  (Id. at 274.)  Also, a chest x-ray had revealed an abnormality.  (Id.)  She could not walk farther than 50 feet, sit for longer than 30 minutes, stand for longer than 10 minutes, and lift or carry ten pounds or more.  (Id.)  Her symptoms would constantly interfere with her ability to pay attention and concentrate.  (Id.)  She would be absent from work at least three days every month.  (Id.)  And, she had to avoid extreme cold or heat, high humidity, chemicals, solvents and cleaners, and perfumes, fumes, odors, dusts, and gases.  (Id.)

Asked by Plaintiff's attorney if the foregoing impairments, symptoms, and restrictions existed on or before December 31, 1995, Dr. Piening replied that they did and that they continued to the present.  (Id. at 277.)

Pursuant to Plaintiff's earlier application, a counselor with the State of Missouri's Section of Disability Determinations completed a Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff in April 2002. (Id. at 71-78.) Rheumatoid arthritis was listed as the primary diagnosis; lupus was the secondary diagnoses; and high blood pressure and anemia were additional alleged impairments. (Id. at 71.) During the relevant time period between March 1992 and December 1995, Plaintiff's exertional limitations were described as being able to occasionally lift 50 pounds, to frequently lift 25 pounds, and to stand, walk, or sit for approximately 6 hours during an 8-hour workday. (Id. at 72.) The counselor noted that during the relevant time period, Plaintiff had a diagnosis of discoid lupus with skin involvement, some cramping, and slight limitations in her functioning due to her condition, but her overall functioning was not significantly limited. (Id.) She had no postural, manipulative, visual, or communicative limitations. (Id. at 73-75.) Her only environmental limitation was a need to avoid even a moderate exposure to "fumes, odors, dusts, gases, poor ventilation, etc." and to solvents and chemicals on the skin. (Id. at 75.) The counselor further noted that the activities of daily living and comments on functioning all related to the present. (Id. at 76.) There was nothing in the file to indicate her allegations or complaints during her period of eligibility. (Id.)

**The ALJ's Decision**

The ALJ first noted that Plaintiff had filed a DIB application in February 2002, alleging she had been disabled since March 15, 1992, but had not pursued it after the initial denial on April 9, 2002.  (Id. at 11.)  She filed the pending application on July 15, 2003.  (Id.)  An issue to be resolved was whether that prior application was res judicata.  (Id.)  If so, the question was whether the evidence warranted reopening and revising it; if not, the question was whether Plaintiff was entitled to DIB under the Act.  (Id.)

After outlining Plaintiff's allegations and the applicable standards, the ALJ found, in part, as follows:

> The claimant's only severe problem which waxed and waned around the time of her date last insured and thereafter, was a rash from her discoid lupus erythematosus but it would not have disabled her for any 12 months beginning by her date last insured.

> The letter from the claimant's treating physician, Kurt A. Piening, M.D., dated May 8, 2001, . . . which relates . . . back to December 31, 1995, is given no weight for the period prior to or for any 12 continuous months from or before her date last insured because the records only mention joint pain one time (may 25, 1995) before her date last insured expired, but by March 1996, she was reporting no joint symptoms.  The treatment notes in between do not mention any report of joint pain.

> When Stephen C. Ross, M.D., saw her first on December 28, 1996, the claimant mentioned some arthralgias, but she "denied peripheral joint symptomatology."  Dr. Ross' office notes between September 1997 and December 1997 state that the claimant felt much better, skin is much improved, joints continue to do well, and "regarding joints, grips 100 percent with no synovitis and no nodes; and joints are good and rash is under control.["]

> There are no treatment notes after March 1996 of Dr. Piening or Boonslick Medical Group, Inc., that Dr. Piening is with and some of Dr. Ross afer

December 1997 (for example, February 1998) mention arthralgias or polyarthralgias[10] in the knees and ankles, but these are all after her date last insured.

Dr. Piening's letter also mentions side effects from medication, but the first treatment note mentioning significant medication side effects is September 6, 2002 and Dr. Piening's statement that her mobility and stamina are severely limited is not supported by any treatment notes until that of November 2004 which states "unsteady on feet" and "fatigue – sleeping a lot."

(Id. at 13) (Citations to record omitted; alterations added.)

Citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted), the ALJ concluded that Plaintiff's allegations of disabling symptoms were not credible. (Id.) She did have, however, some symptoms limiting her ability to work. (Id.) Those limitations were to occasionally lift no more than 20 pounds and frequently lift no more than 10 pounds. (Id.) The limitations did not affect her ability to do light work. (Id.) Given her age at the relevant time, her limited education, and her functional limitations, she could have returned to her past relevant work and, if she could not have, she could perform the full range of light work. (Id. at 13-14.) She was not, therefore, disabled on or before December 31, 1995, within the meaning of the Act. (Id. at 14.) The earlier adverse administrative decision was final and res judicata. (Id.)

_____

[10]This is an error. Plaintiff was diagnosed with polyarteritis. The error does not affect the substantive outcome.

**Legal Standards**

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B) (alterations added).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520. See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alteration added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. <u>See</u> 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added). Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added). Some medical evidence must be included in the record to support an ALJ's RFC holding. **Id.** at 867. "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so

long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)). Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.** See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent."). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. See **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

"Where the claimant has the [RFC] to do either the specific work previously done or the same type of work as it is generally performed in the national economy, [as the VE

testified in the instant case], the claimant is found not to be disabled." **Lowe**, 226 F.3d at 973 (alterations added).

The burden at step four remains with the claimant.  See **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.  "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." **Pearsall**, 274 F.3d at 1217.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937.  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision."  **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision.  **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998).  The court may not reverse that decision merely substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently." **Strongson**, 361 F.3d at 1070.  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must

affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

**Discussion**

Plaintiff argues that the ALJ erred by (1) not providing an adequate rationale for discounting Dr. Piening's opinion; (b) not recontacting Dr. Piening if he felt that the doctor's disability report was inadequate; (c) not providing specific rationale for rejecting Plaintiff's testimony; and (d) not fully developing the record as to the physical and mental demands of Plaintiff's past relevant work. The assessed his residual functional capacity, in part, by failing to (a) develop the record and (b) meaningfully discuss and weigh all the medical opinions; (2) assessed his credibility; and (3) phrased the hypothetical question to the VE. The Commissioner disagrees.

Dr. Piening's Opinion. Dr. Piening opined in May 2001 that Plaintiff was disabled, reaffirmed that opinion in 2004; and in 2005 opined that she was also disabled on or before December 31, 1995. It is this last opinion, however, that is the relevant one. Plaintiff argues that the ALJ improperly failed to explain why he discounted it. See **Wilson v. Apfel**, 172 F.3d 539, 542 (8th Cir. 1999) (reaffirming that treating physician's opinion is entitled to substantial weight, but not controlling weight since the record must be evaluated as a whole). The ALJ did explain, detailing Dr. Piening's treatment notes before December 1995 and noting the paucity of support in those notes for his conclusory opinion at least nine years later that she had been disabled then. See **Black v. Apfel**, 143 F.3d 383, 386 (8th Cir. 1998) (noting that an ALJ's duty to develop the record fully and fairly does not require that every

- 24 -

piece of evidence submitted be discussed, nor did an ALJ's failure to cite specific evidence indicate that such evidence was not considered). Plaintiff's first argument is without merit.

Recontacting Dr. Piening. Plaintiff next argues that if the medical records of Dr. Piening do not support his opinion, it was the duty of the ALJ to recontact him.

The duty to fully and fairly develop the record exists, "even when, as in this case, the claimant is represented by counsel." **Nevland v. Apfel**, 204 F.3d 853, 857 (8th Cir. 2000). Accord **Snead v. Barnhart**, 360 F.3d 834, 838 (8th Cir. 2004); **Weber v. Barnhart**, 348 F.3d 723, 725 (8th Cir. 2003). This duty arises "[b]ecause the social security disability hearing is non-adversarial . . . [and] the ALJ's duty to develop the record exists independent of the claimant's burden in the case." **Stormo v. Barnhart**, 377 F.3d 801, 806 (8th Cir. 2004) (alterations added). Also, this duty requires that the ALJ neutrally develop the facts, **id.**, recontacting medical sources and ordering consultative examinations if "the available evidence does not provide an adequate basis for determining the merits of the disability claim," **Sultan v. Barnhart**, 368 F.3d 857, 863 (8th Cir. 2004). If, however, a crucial issue is not undeveloped, the ALJ is not required to seek additional evidence. See **Goff v. Barnhart**, 421 F.3d 785, 791 (8th Cir. 2005).

In the instant case, a crucial issue was not undeveloped. The ALJ had before him Dr. Piening's treatment notes for Plaintiff during the relevant time period between March 1992 and December 1995. Plaintiff does not contend that treatment or other medical records relevant to that time period were not included in the record. The included notes support the ALJ's decision to discount an opinion rendered years later and after more extensive treatment

that Plaintiff was disabled as of December 31, 1995.  Therefore, the ALJ was not required to seek additional evidence.

Plaintiff's Credibility.  As noted above, when evaluating a claimant's RFC, the ALJ must consider, inter alia, the claimant's own descriptions of his limitations.  **Pearsall**, 274 F.3d at 1217.  Consequently, the ALJ must evaluate the claimant's credibility.  **Id.** at 1218. See also **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006) (noting that ALJ had to assess claimant's credibility before determining his RFC).  "'Where adequately explained and supported, credibility findings are for the ALJ to make.'"  **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (quoting Lowe, 226 F.3d at 972).  Plaintiff argues that the ALJ's adverse credibility findings are neither explained nor supported.

The ALJ did note the lack of any objective medical evidence to support Plaintiff's complaints.  This is a proper consideration.  See **Raney v. Barnhart**, 396 F.3d 1007, 1011 (8th Cir. 2005); **Stephens v. Shalala**, 50 F.3d 538, 541 (8th Cir. 1995).  The ALJ also cited Polaski.  Although he did not detail any other reasons for his discrediting of Plaintiff's testimony about her symptoms, it is clear that he considered all the Polaski factors, including the lack of aggressive treatment and complaints about medications' side effects.  As noted by the Commissioner, "[t]he ALJ need not explicitly discuss each Polaski factor." **Strongson**, 361 F.3d at 1072 (alteration added).  "It is sufficient if he acknowledges and considers those factors before discounting a claimant's subjective complaints."  **Id.**  Accord **Lowe**, 226 F.3d at 972.  The ALJ did so in the instant case.  His failure to go into greater detail is not fatal

in this case, particularly in the context of Plaintiff testifying in February 2005 about her impairments and limitations before January 1996.

Past Relevant Work.  In her final argument, Plaintiff contends the ALJ improperly failed to discuss the specific demands of her past relevant work.  See **Pfitzner v. Apfel**, 169 F.3d 566, 569 (8th Cir. 1999) (reversing decision of ALJ who had failed to make explicit findings about claimant's past relevant work *and* her RFC).  This issue need not be reached, however, because the ALJ further found that Plaintiff had the RFC to perform the full range of light work.[11]  Plaintiff does not take issue with this finding.

---

[11]Light work is defined as work "involv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b) (alterations added).

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (alterations added) (interim citations omitted). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 5th day of March, 2007.